1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>vs.<br>GLADYS VASQUEZ VALENZUELA et al.,<br>Defendants. | ) ) ) ) ) ) ) ) ) ) | CASE NO. CR 07-00011 MMM<br><br>ORDER DENYING DEFENDANTS'<br>MOTION TO DISMISS INDICTMENT |

Defendants are charged collectively with conspiracy to (a) import aliens for immoral purposes (i.e., prostitution) and (b) commit sex trafficking offenses in violation of 18 U.S.C. § 371. They are also charged individually with substantive counts of (1) sex trafficking of minors by force, fraud, and coercion (18 U.S.C. § 1591(a)(1)); (2) transportation of minors for purposes of prostitution (18 U.S.C. § 2423(a)); (3) importation and harboring of aliens for purposes of prostitution (18 U.S.C. § 1328); (4) harboring illegal aliens (18 U.S.C. § 1324(a)(1)(A)(iii)); and (5) transportation of illegal aliens (18 U.S.C. § 1324(a)(1)(A)(ii)).

On August 18, 2008, defendant Maria de los Angeles Vicente ("Vicente") filed a motion to dismiss the indictment, alleging prosecutorial suppression of exculpatory evidence.[1]

---

[1]Notice of Motion, Motion and Memorandum of Points and Authorities in Support of Motion to Dismiss Indictment for Prosecutorial Suppression of Exculpatory Evidence or in the Alternative for an Order Compelling Discovery and a Continuance of Trial ("Mot. to Dismiss

1    Alternatively, Vicente sought an order compelling discovery and a continuance of trial.

2    Defendants Gabriel Mendez and Gladys Vasquez Valenzuela joined the motion to dismiss on

3    August 21, 2008.[2]  Defendant Mirna Vasquez Valenzuela joined on August 22, 2008.[3]

4

5                                    **I.  FACTUAL BACKGROUND**

6            On June 25, 2008, the court directed all parties to complete an exchange of discovery by

7    August 4, 2008.[4]  Defendants received approximately 6,240 pages of documents, Bates-stamped,

8    together with several CDs and other media, from the government by this deadline.[5]  Various of

9    the documents the government produced referenced law enforcement raids that occurred in

10   October 2006.[6]  These raids – called "welfare checks" –  targeted several residences, including

11   the residence where Vicente lived at the time.[7]  On August 11, 2008, Vicente's lawyer, Jeff Price,

12   emailed government attorneys Cheryl Murphy, Sarah Heidel, and Andrew Kline.  Price requested

13   disclosure of "all documents pertaining to all raids conducted during the months of October,

14   November and December 2006, by the FBI, ICE and DOL-OIG, of all residences . . . in which

15

16   ────────────────

17   Indictment"), Docket No. 422 (Aug. 18, 2008) at 2.

18        [2]Defendant Gladys Vasquez Valenzuela's Joinder in Co-Defendant Maria de los Angeles
19   Vicente's Motion to Dismiss Indictment ("Klein Joinder"), Docket No. 439 (Aug. 21, 2008) at
20   1-2; Defendant Gabriel Mendez's Joinder in Defendant Maria de los Angeles Vicente's Motion
     to Dismiss, and in the alternative, Request for a Continuance of the Trial Date ("Cephas
21   Joinder"), Docket No. 440 (Aug. 21, 2008) at 1.

22        [3]Joinder of Defendant Mirna Vasquez Valenzuela in Motions and Pleadings of Other
23   Defendants ("Buehler Joinder"), Docket No. 445 (Aug. 22, 2008) at 1.

24        [4]See Order Granting Defendants' Motion for Reconsideration in Part and Denying
     Defendants' Motion for a Stay, Docket No. 362 (June 25, 2008) at 12.
25
          [5]Mot. to Dismiss Indictment at 7.
26
          [6]Declaration of Jeff Price in Support of Motion to Dismiss Indictment ("Price Decl."),
27   attached to Mot. to Dismiss Indictment, at 1.

28        [7]*Id.* at 2.

                                                2

the defendants and/or the alleged victims . . . resided."[8]   Price asked the government to "acknowledge that such 'raids' did occur at the residences at which the defendants and alleged victims resided" and requested a reply within 24 hours.[9]   Later that day, Assistant U.S. Attorney Cheryl Murphy confirmed receipt of Price's request but stated that she would be unable to respond within 24 hours.[10]   Murphy offered no substantive response to Vicente's discovery request at that time.[11]

On August 18, Vicente filed a motion to dismiss the indictment or, in the alternative, for an order compelling discovery and continuing the trial.   Vicente alleged that the government had not provided "a single report from any law enforcement agency describing the October 2006 raids, or the planning, execution or operations related to the raids" by the August 4, 2008 discovery cut-off deadline.[12]   She also asserted that, as of August 18, 2008, defendants had received no "written reports or case notes resulting from interviews with the occupants of the homes raided, nor . . . any search warrant affidavits or service reports, photos taken by law enforcement officers during the raids, evidence confiscated during the raids, . . . electronic eavesdropping and/or video recording devices installed or retrieved during the raids, or . . . copies of any recordings of telephone or radio communications between and among law enforcement agencies involved in the raids."[13]

In his joinder, Mendez asserted that the government might be in possession of exculpatory evidence that it had not produced concerning cell phones in the alleged victims' possession while

---

[8]Mot. to Dismiss Indictment at Exh. 301.

[9]*Id.*

[10]*Id.* at Exh. 302.

[11]*Id.*

[12]Price Decl. at 3.

[13]*Id.* at 3-4.

they were purportedly being held hostage.[14]  Mendez also noted that the government had produced "several hundred pages of discovery related to a confidential informant" on August 12, 2008, after the court-imposed deadline, and that defendants had not had time, as of August 21, to review these materials and ascertain what, if any, exculpatory evidence they contained.[15]  Given these purported discovery deficiencies, defendants maintained that the government had violated its duty to disclose exculpatory and/or impeachment evidence in contravention of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972).[16]

The day Vicente's motion to dismiss the indictment was filed, the government sent an email to defense counsel that attached forty pages of discovery materials;[17] much of this information concerned the October 2006 raids and other investigative activity by government officials in October and November 2006 (before defendants' arrest in December 2006).[18]  One week later, immediately prior to the August 25 hearing on this motion, the government produced two CDs containing cell phone data retrieved from telephones purportedly used by the alleged victims.

Citing this chronology, Vicente asserts that the government has suppressed exculpatory evidence; she contends that this constitutes prosecutorial misconduct that has deprived defendants of their right to fair trial and due process of law and that warrants dismissal of the indictment.[19]  Mendez asserts that the government's recent production of documents and cell phone records at a minimum merits a continuance so that defendants will have sufficient time to conduct follow-up

---

[14]Cephas Joinder at 3-4.

[15]*Id.* at 4.

[16]Mot. to Dismiss Indictment at 9-16.

[17]See Government's Opposition to Defendant Maria de los Angeles' Motion to Dismiss Indictment for Prosecutorial Suppression of Exculpatory Evidence; Declaration of Sarah J. Heidel; Exhibits ("Govt.'s Opp."), Docket No. 447 (Aug. 22, 2008) at Exhs. A-E.

[18]Cephas Joinder at 2.

[19]Mot. to Dismiss Indictment at 15.

4

investigations and review the newly produced materials.[20]

## II. DISCUSSION

### A.        Standards Governing Pretrial Disclosure of Evidence in Criminal Cases

The government has a constitutional duty to disclose, upon request, all evidence favorable to a defendant that is material either to guilt or to punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment"); *United States v. Agurs*, 427 U.S. 97, 106-07 (1976) ("In many cases, however, exculpatory information in the possession of the prosecutor may be unknown to defense counsel. In such a situation he may make no request at all, or possibly ask for 'all Brady material' or for 'anything exculpatory.'  Such a request really gives the prosecutor no better notice than if no request is made. . . . But if the evidence is so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce, that duty should equally arise even if no request [or a general 'all Brady material' request] is made"); see also *United States v. Ruiz*, 536 U.S. 622, 627-28 (2002) ("[A] federal criminal defendant's . . . right to receive from prosecutors exculpatory impeachment material [is] a right that the Constitution provides as part of its basic 'fair trial' guarantee," citing *Brady* and U.S. CONST. AMENDS. V and VI).

Evidence "is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985); see also *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citing *Bagley*).  The government's obligations under *Brady* are "not confined[,] [however,] to evidence that affirmatively proves a defendant innocent: Even if evidence is merely 'favorable to the accused,' its suppression violates *Brady* if prejudice results." *Gantt v. Roe*, 389 F.3d 908, 912 (9th Cir. 2004) (citing *Brady* and *Strickler*).  When determining materiality for purposes of *Brady*, the allegedly suppressed evidence is "considered collectively, not item by item." *Kyles*

---

[20]Cephas Joinder at 2-4.

1  *v. Whitley*, 514 U.S. 419, 437 (1995).

2      The *Brady* rule has been construed to include impeachment as well as exculpatory

3  evidence. *Giglio v. United States*, 405 U.S. 150, 154 (1972) ("When the 'reliability of a given

4  witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting

5  credibility falls within this general rule" (citation omitted)); *Bagley*, 473 U.S. at 676

6  ("Impeachment evidence, however, as well as exculpatory evidence, falls within the *Brady* rule.

7  . . . Such evidence is 'evidence favorable to an accused,' . . . so that, if disclosed and used

8  effectively, it may make the difference between conviction and acquittal"). Thus, a promise of

9  a benefit to a witness must be disclosed under *Brady*. See *Giglio*, 405 U.S. at 154-55 ("Here the

10  Government's case depended almost entirely on Taliento's testimony; without it there could have

11  been no indictment and no evidence to carry the case to the jury. Taliento's credibility as a

12  witness was therefore an important issue in the case, and evidence of any understanding or

13  agreement [with the government] as to a future prosecution would be relevant to his credibility and

14  the jury was entitled to know of it").

15      The *Brady* obligation extends to all government actors, not just the individual prosecutor

16  or prosecutorial team assigned to the case. See *Kyles*, 514 U.S. at 437 ("[T]he individual

17  prosecutor has a duty to learn of any favorable evidence known to the others acting on the

18  government's behalf in the case, including the police"); *United States v. Blanco*, 392 F.3d 382,

19  388 (9th Cir. 2004) ("A prosecutor's duty under *Brady* necessarily requires the cooperation of

20  other government agents who might possess *Brady* material"). The prosecution's good or bad

21  faith is irrelevant. *Brady*, 373 U.S. at 87; see also *Giglio*, 405 U.S. at 154 ("[W]hether the

22  nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor"). The

23  prosecution's constitutional obligation to disclose material evidence to defendants is not "measured

24  by the moral culpability, or the willfulness, of the prosecutor. . . . If the suppression of evidence

25  results in constitutional error, it is because of the character of the evidence, not the character of

26  the prosecutor." *Agurs*, 427 U.S. at 110 (footnote omitted). Given the considerable resources

27  at the prosecution's disposal, and "inherent information-gathering advantages," "if there is to be

28  any imbalance in discovery rights, it should work in the defendant's favor." *Wardius v. Oregon*,

1    412 U.S. 470, 476 n. 9 (1973).

2    **B.    Standards Governing Assessment of Alleged *Brady* Violations**

3    "There are three components of a true *Brady* violation: The evidence at issue must be

4    favorable to the accused, either because it is exculpatory, or because it is impeaching; that

5    evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice

6    must have ensued." *Strickler*, 527 U.S. at 281-82.

7    "As a matter of law, mere speculation by a defendant that the government has not fulfilled

8    its obligations under *Brady v. Maryland* . . . is not enough to establish that the government has,

9    in fact, failed to honor its discovery obligations." *United States v. Upton*, 856 F.Supp. 727, 746

10   (E.D.N.Y. 1994) (citations omitted); see also *United States v. Michaels*, 796 F.2d 1112, 1116 (9th

11   Cir. 1986) (noting that mere speculation regarding the existence of potentially exculpatory

12   evidence does not require the district court to make materials available for defendant's inspection;

13   rather, defendant must make a specific request so that the court can determine if the evidence will

14   affect the outcome of the trial).

15   Defendants, moreover, bear the burden of showing that the government has failed to

16   disclose material or exculpatory evidence.  See *Harris v. United States*, 9 F.Supp.2d 246, 275

17   (S.D.N.Y. 1998) ("[T]he government does not bear the burden of establishing that documents

18   were not withheld; it is [defendant's] burden to prove that the government failed to disclose

19   evidence favorable to [him]," citing *United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995)).

20   Conclusory allegations that the government has withheld evidence will not entitle defendants to

21   relief or to an evidentiary hearing.  See *id*. ("Conclusory allegations that the government

22   'suppressed' or 'concealed' evidence do not entitle [defendant] to relief; nor do they suffice to

23   entitle [him] to an evidentiary hearing on whether documents were withheld").[21]

24   ─────────────────

25   [21]See also *United States v. Avellino*, 136 F.3d 249, 260-61 (2d Cir. 1998) ("The
     government informed the court that it had 'disclosed all the state materials in the possession of
26   federal authorities to [defendant]. . . .  In the absence of a proffer by [defendant] of any
     nonspeculative basis for inferring that, in response to the plea withdrawal motion, the government
27   had not made available to him all pertinent material in its possession, it was well within the
     discretion of the court to conclude that no evidentiary hearing was necessary"); *United States v.*

28

1    When the government "represents that it 'has produced every document in its possession

2    which relates in any way to [an issue]' . . . the court must assume the veracity of that

3    representation." *Upton*, 856 F.Supp. at 746.  To hold otherwise would require the court to

4    assume an unmanageable oversight role.  See *id.* ("The alternative to such an assumption would

5    require the court to examine numerous file drawers of documents to verify [the government's]

6    representation which is as obviously undesirable as it is impractical").

7    **C.    Whether to Grant Defendants' Motion to Dismiss the Indictment Based on**

8    **Alleged *Brady* Violations**

9    **1.    Exculpatory or Impeaching Evidence Favorable to the Accused**

10    As of the August 25, 2008 hearing on this motion, defendants acknowledged receipt of the

11    following *Brady/Giglio* material: (1) immunity agreements for government witnesses dating back

12    to 2006;[22] (2) various interviews and other records concerning the October 2006 "welfare checks"

13    conducted by law enforcement officials;[23] (3) compact discs containing electronic information from

14    cell phones seized during the investigation;[24] and (4) additional compact discs containing Spanish

15    telephone conversations, which may serve to impeach the government's confidential informant.[25]

16

17    *Evanchik*, 413 F.2d 950, 953 (2d Cir. 1969) ("[T]he assurance by the government that it has in

18    its possession no undisclosed evidence that would tend to exculpate defendant justifies the denial

19    of a motion for inspection that does not make some particularized showing of materiality and
     usefulness").

20    [22]Reporter's Transcript of Proceedings August 25, 2008 ("Aug. 25 Transcript"), at 45,

21    lines 23-25 and 46, lines 1-2.  This evidence was produced at 7:30 p.m. on August 24, 2008.

22    (*Id.*)

23    [23]Aug. 25 Transcript at 46, lines 5-9.  This evidence was produced on August 18, 2008.
     (*Id.*)

24    [24]Aug. 25 Transcript at 47, lines 4-12.  This evidence was produced at approximately 12

25    noon on August 25, 2008.  (*Id.*)

26    [25]Aug. 25 Transcript at 48, lines 12-20.  This evidence was produced on August 12, 2008.

27    (*Id.* at 58, lines 7-10 and 59, lines 6-16.)  Citing safety concerns related to the witness, the
     government applied for and received court authorization to disclose the cooperating witness'

28    identity (and impeachment material concerning him) shortly after the discovery cut-off date; the

There are two additional categories of exculpatory or impeaching evidence, therefore: (1) exculpatory or impeachment evidence derived from the government's ongoing pretrial interviews of the alleged victims; and (2) further materials generated by law enforcement agencies involved in the October 2006 "welfare checks."

## 2.    Suppression of *Brady* Evidence

At the August 25, 2008 hearing, the court reminded the government of the August 4 deadline for reciprocal discovery,[26] and directed it to complete pretrial interviews of the alleged victims to determine whether any additional victims admitted that they had worked as prostitutes in Guatemala.[27]   The government was instructed to disclose any further exculpatory evidence disclosed in the interviews,[28] including, but not limited to, exculpatory evidence on the subject of prior prostitution, to defendants on or before 12 noon on August 29, 2008.

As regards evidence related to the October 2006 "welfare checks," the government asserts that various reports, handwritten notes, and memoranda were discovered and disclosed to defendants between August 12 and 22, 2008, following receipt of the August 11 email Vicente's counsel sent requesting further evidence.[29]   The evidence disclosed included an October 20, 2006 FBI report summarizing the "welfare checks" that were conducted on October 11, 2006; a December 6, 2006 ICE report describing statements made to an ICE special agent by an alleged victim during a "welfare check"; handwritten notes dated October 11, 2006 taken by an ICE special agent during the "welfare checks"; an October 20, 2006 FBI report reflecting statements

government disclosed the information in accordance with the court's order and well in advance of the scheduled trial date.

[26]Aug. 25 Transcript at 41-45.

[27]See Order re Defendants' Requests for Continuance; Government's Pretrial Interviews of Alleged Victims; Severance of Defendant Maria De Los Angeles Vicente for Trial ("Aug. 26 Order"), Docket No. 459 (Aug. 26, 2008) at 2.

[28]*Id.*   On August 22, 2008, the government clarified that the interviews it had already disclosed to defendants concerned Minor Female #4 and Jane Doe #7.   (Govt.'s Opp. at 6-7.)

[29]Govt.'s Opp. at 4-5.

made by one defendant's son during an October 11, 2006 welfare check; and an August 11, 2008 ICE report of an interview with another alleged victim.[30]  The government also stated that it had contacted officials at the Los Angeles Police Department ("LAPD"), FBI, and ICE to obtain any further information or evidence generated during the October 2006 "welfare checks."[31]  In response to its inquiry, the government received and produced to defendants two additional FBI reports, which described government efforts to obtain additional responsive information from the FBI and ICE; a letter describing the content of an internal ICE report referencing the October 2006 "welfare checks"; three pages of handwritten LAPD "daily logs," which referenced October 11, 2006 "welfare checks"; and a one-page "call out sheet" detailing an LAPD officer's response to a call regarding human trafficking on October 11, 2006.[32]

The government represents that, contrary to Vicente's allegations, the Department of Labor Office of Inspector General ("DOL-OIG") and the Coalition to Abolish Slavery and Trafficking ("CAST") were *not* involved in the October 2006 "welfare checks."[33]

Based on the present record, the court concludes that defendants have not established that the prosecution is suppressing exculpatory or impeachment evidence in violation of its *Brady/Giglio* obligations.  To the contrary, the government responded to the August 11 email from Vicente's counsel by contacting agents and producing potentially responsive evidence to the defense.[34]

### 3.    Prejudice to Defendants

Although the government did not produce the material by the court-ordered discovery cut-off date of August 4, 2008, delayed disclosure of potential exculpatory and impeachment evidence

---

[30]*Id.* at 8-9.

[31]*Id.* at 9.

[32]*Id.* at 9-10.

[33]*Id.* at 10.

[34]*Id.* at 3-5, 11.

1   does not constitute a *Brady* violation so long as defendants have the material in sufficient time to

2   investigate and make use of it at trial.  See, e.g., *United States v. Davenport*, 753 F.2d 1460,

3   1462 (9th Cir. 1985) ("Davenport further claims that the prosecution's failure at the pretrial

4   hearing to disclose the fact that a witness to a lineup identification had previously been asked to

5   identify the robber amounted to a suppression of exculpatory evidence under [*Brady*].  Disclosure,

6   to escape the *Brady* sanction, must be made at a time when the disclosure would be of value to the

7   accused. . . .  Here, Davenport had access to the exculpatory information from the beginning of

8   trial and made use of it in cross-examining a witness.  The delay in providing the information does

9   not, therefore, constitute a due process violation" (citations omitted)).[35]  Put differently, showing

10  that the prosecution has not disclosed exculpatory evidence is not enough to establish a *Brady*

11  violation; defendants must also show that they suffered prejudice by demonstrating a reasonable

12  probability that the outcome of the trial would have been different had the evidence been

13

---

14       [35]Even if defendants had shown that the government suppressed exculpatory or

15  impeachment evidence in violation of *Brady* – which they have not – "such a due process violation

16  may be cured . . . by belated disclosure of evidence, so long as the disclosure occurs . . . at a time

     when disclosure would be of value to the accused . . . ."  *United States v. Gamez-Orduno*, 235

17  F.3d 453, 461 (9th Cir. 2000) (quoting *United States v. Span*, 970 F.2d 573, 583 (9th Cir. 1992);

18  *United States v. Gordon*, 844 F.2d 1397, 1403 (9th Cir. 1988)).  See also *United States v.*

     *Browne*, 829 F.2d 760, 765 (9th Cir. 1987) ("Here, the disclosure of Anderson's report, though

19  tardy, was still 'of value' to Browne.  While it is true that the government did not release the

     Anderson report to Browne until after several witnesses had testified, the evidence was not

20  withheld from Browne throughout the entire trial [so there was no *Brady* violation]," citing

     *Davenport*); see also *United States v. Fallon*, 348 F.3d 248, 252 (7th Cir. 2003) ("Fallon argues

21  that his trial strategy was affected by the late disclosure of Borgetti's statements.  Materiality

22  focuses not on trial preparation, but instead on whether earlier disclosure would have created a

     reasonable doubt of guilt. . . .  Accordingly, despite Fallon's insistence that the delayed disclosure

23  caused the defense's theory to shift midstream and undermined the defense counsel's credibility

24  with the jury, the salient issue remains whether the late disclosure of Borgetti's statements

     undermines confidence in the outcome of the trial"); *United States v. Diaz*, 922 F.2d 998, 1007

25  (2d Cir. 1990) ("Moreover, even where there has been a *Brady* violation, a defendant is not

     entitled to reversal unless he can show that the delayed disclosure caused him prejudice," citing

26  *United States v. Brown*, 582 F.2d 197, 200 (2d Cir.), cert. denied, 439 U.S. 915 (1978); *United*

27  *States v. Word*, 806 F.2d 658, 665 (6th Cir. 1986) ("In general, the principles announced in *Brady*

     do not apply to a tardy disclosure of exculpatory information, but to a complete failure to

28  disclose"), cert. denied, 480 U.S. 922 (1987)).

1    disclosed.  *Gantt*, 389 F.3d at 913; *Strickler*, 527 U.S. at 263.

2         Defendants make no such showing here.  Although the evidence in question was disclosed

3    after the August 4, 2008 discovery cut-off date, the government produced the material before trial

4    began.  Disclosure came at a time when the evidence retained its "value to the accused[s]," as

5    defense counsel will be able to utilize and/or incorporate the information moving forward.

6    Particularly because trial has not yet begun, defendants cannot make the required showing that the

7    outcome in their case would have been different.[36]

8                    **4.    Dismissal of Indictment is an Extreme Remedy**

9         Dismissal of a valid indictment is an "extreme remedy," *United States v. Lopez*, 4 F.3d

10   1455, 1464 (9th Cir. 1993), and a "drastic step" that is "disfavored," *United States v. Jacobs*, 855

11   F.2d 652, 655 (9th Cir. 1988).   "A district court may dismiss an indictment on the ground of

12   outrageous government conduct if the conduct amounts to a due process violation." *United States

13   v. Barrera-Moreno*, 951 F.2d 1089, 1091 (9th Cir. 1991) (citing *United States v. Simpson*, 813

14   F.2d 1462, 1464-65 (9th Cir.), cert. denied, 484 U.S. 898 (1987) (*Simpson I*)).   "If the conduct

15   does not rise to the level of a due process violation, the court may nonetheless dismiss under its

16   supervisory powers.  These powers may be exercised for three reasons: to remedy a constitutional

17   or statutory violation; to protect judicial integrity by ensuring that a conviction rests on appropriate

18   considerations validly before a jury; or to deter future illegal conduct." *Barrera-Moreno*, 951

19   F.2d at 1091 (citing *United States v. Simpson*, 927 F.2d 1088, 1090 (9th Cir. 1991) (*Simpson II*)).

20        To violate due process, governmental conduct must be "so outrageous that due process

21   principles would absolutely bar the Government from invoking judicial process to obtain a

22   conviction." *United States v. Restrepo*, 930 F.2d 705, 712 (9th Cir. 1991) (quoting *United States*

23   _____

24        [36]Courts have denied defendants' allegations of *Brady* violations in cases where evidence
     was disclosed *even after trial was underway*.  See *Gordon*, 844 F.2d at 1403 ("*Brady* does not
25   necessarily require that the prosecution turn over exculpatory material *before* trial"); *Span*, 970
     F.2d at 582-83 (holding that there was no *Brady* violation where the prosecution turned over the
26   grand jury testimony of an FBI agent after the agent had been cross-examined at trial, since "any
     prejudice caused by delayed disclosure was mitigated by the district court's decision to allow
27   [defendants] to recall [the FBI agent] to the stand if they chose to do so").
28

1    *v. Russell*, 411 U.S. 423 (1973)).  In this case, the government has attempted to comply with its

2    *Brady/Giglio* obligations, if belatedly, and responded promptly to defense requests for additional

3    evidence.  Its actions simply do not rise to the level of "outrageous" misconduct.

4         For a court to dismiss an indictment for prosecutorial misconduct under its supervisory

5    powers, defendants must show both flagrant misbehavior and substantial prejudice.  *United States*

6    *v. Kearns*, 5 F.3d 1251, 1254 (9th Cir. 1993) (citing *United States v. Jacobs*, 855 F.2d 652, 655

7    (9th Cir. 1988) (per curiam)).  The record here reflects neither.  While it is true that a district

8    judge may sanction prosecutorial misconduct that is neither flagrant nor prejudicial, "the sanction

9    chosen must be proportionate to the misconduct," *Jacobs*, 855 F.2d at 655.  In this instance,

10   where the government has produced – albeit belatedly – additional *Brady* materials, dismissal of

11   the indictment would be a disproportionate sanction.

12        **D.    Whether to Grant Defendants' Request for Alternative Relief**

13        In the event her motion to dismiss is denied, Vicente seeks alternative relief in the form of

14   an order compelling discovery and continuing the trial.[37]  Mendez and Mirna Vasquez Valenzuela

15   join in this request.[38]

16        Following the August 25 hearing on this motion, the court issued an order on August 26,

17   2008, continuing the trial one week to September 9, 2008, and directing the government to

18   complete its pretrial interviews of the alleged victims and disclose any *Brady* evidence developed

19   as a result no later than August 29, 2008.[39]  The same order severed trial of the charges against

20   Vicente from trial of the charges against all other defendants because her attorney had health

21

22

23   _____

24        [37]Mot. to Dismiss Indictment at 16.

25        [38]At the August 25, 2008 hearing, Vicente's lawyer appeared confused regarding his
26   August 11 filing, and stated that he sought only to dismiss counts involving Minor Female #4, not
     the entire indictment.  (Aug. 25 Transcript at 51.)  His motion was broader, however, and it was
27   that motion that defendants Mendez and Mirna Vasquez Valenzuela joined.

28        [39]Aug. 26 Order at 2.

                                                    13

1   issues that precluded him from commencing trial on September 9.[40]

2   On September 1, 2008, defendant Mirna Vasquez Valenzuela filed an *ex parte* application,

3   which all other defendants joined, seeking reconsideration of the order severing Vicente for trial.[41]

4   Defendants requested that the court order a joint trial; they alleged that there had been "significant

5   cooperation and joint effort by defense counsel in preparing for trial . . . [and thus that] [t]he[ir]

6   ability to render effective assistance of counsel depends on the preservation of that joint defense

7   for trial."[42]

8   The court heard defendants' *ex parte* application on September 4, 2008.  Vicente's attorney

9   asserted that there had never been a joint defense.  Consequently, the court declined to continue

10   the trial on the basis that his absence would prevent the remaining defense attorneys from

11   providing effective assistance of counsel.[43]  Given the government's tardy production of potentially

12   exculpatory *Brady* materials, however, the court concluded that defendants should be given

13   additional time to review and evaluate that evidence.[44]  Consequently, the court continued the trial

14

15   [40]*Id.* at 3.

16   [41](Corrected) *Ex Parte* Application for Reconsideration of Order Severing One Defendant
17   for Trial and Scheduling Trial on September 9, 2008; Declaration of Dana Cephas; Declaration
18   of Ivan L. Klein; Exhibit, Docket No. 473 (Sept. 1, 2008).

19   [42]*Id.* at 2-3.

20   [43]Reporter's Transcript of Proceedings September 4, 2008 – Unsealed Portion ("Unsealed
21   Sept. 4 Transcript"), at 33, lines 20-24 ([The Court:] "Now the defense has presented two
22   additional reasons why that wasn't a good outcome.  The first of those is this issue of the joint
    defense, and quite honestly, Mr. Price I think has completely undercut that by indicating that as
    far as he was concerned, there was no joint defense").

23   [44][The Court:]
24   "So we're really left with this issue of the cell phones and the ICE files and the rap
25   sheets and all of the other information that has only very recently been produced to
    the defense.  And the Court is not of the view that the government secreted or
26   withheld these phone records from the defense in an effort to sandbag or mislead
    or suppress potentially exculpatory information.  But if the government concedes,
27   as Ms. Murphy just did, having consulted with Mr. Kline, that the fact that the
28   defendants – excuse me, the victims were in possession of cell phones is material

14

1   to January 6, 2008.[45]

2      Given this procedural history, defendants' request for alternative relief is moot, as the

3   continuance that was granted is adequate to permit defendants to review the potentially exculpatory

4   evidence the government has produced and complete their pre-trial preparations.

5

6                                    **III.  CONCLUSION**

7      Although they complain that their receipt of certain *Brady/Giglio* material has been

8   delayed, defendants adduce no evidence that the government has withheld or is withholding

9   exculpatory or impeachment evidence.  Absent particularized allegations by defendants that the

10  government has improperly withheld evidence, the court declines to find that the prosecution has

11  failed to fulfill its *Brady/Giglio* obligations.  Defendants' motion to dismiss the indictment based

12  on prosecutorial misconduct is therefore denied.  Defendants' request for alternative relief in the

13

14

15

16      and potentially exculpatory, then the information that's contained on the cell phones
        is also material and potentially exculpatory.  And it is the prospect that that is true
17      that gives the Court great concern about proceeding on the current schedule in light
        of the application that the defendants have made. . . .

18          But there's certainly information on these CD[s] that, coupled with the
        knowledge which the Court learned only for the first time today, that certain of the
19      alleged victims had cell phones, that could ultimately with some investigation
        produce exculpatory evidence, certainly that the government can argue doesn't
20      prove anything more than that they could have opened a window and called out.
        But that, in the view of the defense, has more value than that.
21
            And so the Court believes that it's now in the position where it's going to
22      have to continue this case.  Not, as I say, because I think the government attempted
        to suppress information, but in an abundance of caution, to ensure that we don't
23      have an issue down the road about this evidence or the fact that the defendants were
        forced to go to trial two weeks after they obtained the evidence."
24
25  (Unsealed Sept. 4 Transcript at 33, line 25; 34, lines 1-15; and 35, lines 4-18.)

26      [45]See also Stipulation Regarding Continuance of Trial and Excludable Time Periods Under
    Speedy Trial Act, Docket No. 496 (Sept. 11, 2008); Order Continuing Trial Date and Findings
27  and Order Re; Excludable Time Pursuant to the Speedy Trial Act, Docket No. 537 (Nov. 13,
28  2008).

form of a trial continuance and/or discovery order are also denied as moot in light of the
continuation of the trial to January 6, 2008.

DATED: December 22, 2008

_Margaret M. Morrow_
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE

16