UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>vs.<br><br>GLADYS VASQUEZ VALENZUELA et al.,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) | CASE NO. CR 07-00011 MMM<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR DISCLOSURE OF *BRADY* MATERIAL RELEVANT TO SENTENCING |
|---|---|---|

    In this multi-defendant prosecution, defendants were charged collectively with conspiracy to (a) import aliens for immoral purposes (i.e., prostitution) and (b) commit sex trafficking offenses in violation of 18 U.S.C. § 371. They were also charged individually with substantive counts of (1) sex trafficking of children or by force, fraud, or coercion in violation of 18 U.S.C. § 1591(a)(1); (2) transportation of minors with intent to engage in criminal sexual activity in violation of 18 U.S.C. § 2423(a); (3) importation of aliens for immoral purposes in violation of 8 U.S.C. § 1328; (4) harboring certain aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(iii) and (a)(1)(B)(i); and (5) transporting certain aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) and (a)(1)(B)(i).[1]

    A jury trial commenced on January 6, 2009 and concluded on February 3, 2009. On

---

[1] Not all defendants were charged in all counts.

February 11, 2009, the jury returned guilty verdicts on twenty-one of the charged counts. The jury was deadlocked on the remaining nineteen counts. Sentencing is set for August 17, 2009.

On June 21, 2009, defendant Maria de los Angeles Vicente ("Vicente") filed a motion seeking disclosure of *Brady* material relevant to sentencing.[2] Defendant Gladys Vasquez Valenzuela joined the motion on June 26.[3] Defendant Mirna Vasquez Valenzuela joined on June 27.[4] Defendant Gabriel Mendez joined on June 28.[5] The government filed opposition on June 29.[6]

## I. FACTUAL BACKGROUND [7]

On June 10, 2009, the probation office disclosed the presentence investigation report for Vicente; defendant contends the report "contains a number of allegations that . . . are

---

[2] Notice of Motion and Motion for Disclosure of *Brady* Material Relevant to Sentencing; Memorandum of Points and Authorities ("Vicente Motion"), Docket No. 806 (June 21, 2009); see also Reply to Opposition to Motion for Disclosure of *Brady* Material Relevant to Sentencing; Declaration of Defendant ("Vicente Reply"), Docket No. 818 (July 6, 2009).

[3] Defendant Gladys Vasquez Valenzuela's Joinder in Co-Defendant Maria de los Angeles Vicente's Motion for Disclosure of *Brady* Material Relevant to Sentencing, Docket No. 812 (June 26, 2009).

[4] Joinder of Defendant Mirna Vasquez Valenzuela in Motion of Defendant Maria de los Angeles Vicente for Disclosure of *Brady* Material Relevant to Sentencing, Docket No. 813 (June 27, 2009).

[5] Defendant Gabriel Mendez's Joinder in Co-Defendant Maria de los Angeles Vicente's Motion for Disclosure of *Brady* Material Relevant to Sentencing, Docket No. 814 (June 28, 2009).

[6] See Government's Opposition to Defendant Maria de los Angeles's Motion to Compel Disclosure of *Brady* Material Relevant to Sentencing; Declaration of Miguel Palomino; Exhibits ("Government's Opposition"), Docket No. 816 (June 29, 2009).

[7] Although three of Vicente's four co-defendants joined the motion, none provided individualized argument as to how the particular types of information Vicente seeks are relevant to their sentencing. Accordingly, the court addresses only Vicente's filing.

2

inaccurate."[8] Vicente challenges the testimony of co-defendant and government cooperator Flor Morale Sanchez, who testified to Vicente's involvement in the charged offenses. The presentence report's offense level computation includes enhancements for Vicente's role in the offense[9] as well as additional enhancements for obstruction of justice[10] based in part on Morales Sanchez's testimony. Vicente seeks to impeach this testimony with evidence that she requests pursuant to *Brady v. Maryland*, 373 U.S. 83, 87 (1963), and its progeny.

## II. DISCUSSION

### A.   Standards Governing Disclosure of Evidence under *Brady*

The government has a constitutional duty to disclose, upon request, all evidence favorable to a defendant that is material either to guilt or to punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment"); *United States v. Agurs*, 427 U.S. 97, 106-07 (1976) ("In many cases, however, exculpatory information in the possession of the prosecutor may be unknown to defense counsel. In such a situation he may make no request at all, or possibly ask for 'all Brady material' or for 'anything exculpatory.' Such a request really gives the prosecutor no better notice than if no request is made. . . . But if the evidence is so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce, that duty should equally arise even if no request [or a general 'all Brady material' request] is made"); see also *United States v. Ruiz*, 536 U.S. 622, 627-28 (2002) ("[A] federal criminal defendant's . . . right to receive from prosecutors exculpatory impeachment material [is] a right that the Constitution provides as part of its basic 'fair trial' guarantee," citing *Brady* and U.S. CONST. AMENDS. V and VI). "The government's

---

[8] Vicente Motion at 6.

[9] Presentence Report as to Defendant Maria de los Angeles Vicente ("PSR"), Docket No. 789 (June 10, 2009), ¶ 86.

[10] *Id.*, ¶¶ 90-92.

*Brady* obligations continue through the time of the sentencing hearing." *United States v. Nikrasch*, 25 Fed.Appx. 570, 572 (9th Cir. Dec. 26, 2001) (Unpub. Disp.) (citing *East v. Scott*, 55 F.3d 996, 1002-04 (5th Cir. 1995)).

Evidence "is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985); see also *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citing *Bagley*). The government's obligations under *Brady* are "not confined[,] [however,] to evidence that affirmatively proves a defendant innocent: Even if evidence is merely 'favorable to the accused,' its suppression violates *Brady* if prejudice results." *Gantt v. Roe*, 389 F.3d 908, 912 (9th Cir. 2004) (citing *Brady* and *Strickler*). When determining materiality for purposes of *Brady*, the allegedly suppressed evidence is "considered collectively, not item by item." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

The *Brady* rule has been construed to include impeachment as well as exculpatory evidence. *Giglio v. United States*, 405 U.S. 150, 154 (1972) ("When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule" (citation omitted)); *Bagley*, 473 U.S. at 676 ("Impeachment evidence, however, as well as exculpatory evidence, falls within the *Brady* rule"). Thus, a promise of a benefit to a witness must be disclosed under *Brady*. See *Giglio*, 405 U.S. at 154-55 ("Here the Government's case depended almost entirely on Taliento's testimony; without it there could have been no indictment and no evidence to carry the case to the jury. Taliento's credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement [with the government] as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it").

The *Brady* obligation extends to all government actors, not just the individual prosecutor or prosecutorial team assigned to the case. See *Kyles*, 514 U.S. at 437 ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police"); *United States v. Blanco*, 392 F.3d 382, 388 (9th Cir. 2004) ("A prosecutor's duty under *Brady* necessarily requires the cooperation of

other government agents who might possess *Brady* material"). The prosecution's good or bad faith is irrelevant. *Brady*, 373 U.S. at 87; see also *Giglio*, 405 U.S. at 154 ("[W]hether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor"). The prosecution's constitutional obligation to disclose material evidence to defendants is not "measured by the moral culpability, or the willfulness, of the prosecutor. . . . If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor." *Agurs*, 427 U.S. at 110 (footnote omitted). Given the considerable resources at the prosecution's disposal, and its "inherent information-gathering advantages," "if there is to be any imbalance in discovery rights, it should work in the defendant's favor." *Wardius v. Oregon*, 412 U.S. 470, 476 n. 9 (1973).

### B. Standards Governing Assessment of Alleged *Brady* Violations

"There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler*, 527 U.S. at 281-82.

"As a matter of law, mere speculation by a defendant that the government has not fulfilled its obligations under *Brady v. Maryland* . . . is not enough to establish that the government has, in fact, failed to honor its discovery obligations." *United States v. Upton*, 856 F.Supp. 727, 746 (E.D.N.Y. 1994) (citations omitted); see also *United States v. Michaels*, 796 F.2d 1112, 1116 (9th Cir. 1986) (noting that mere speculation regarding the existence of potentially exculpatory evidence does not require the district court to make materials available for defendant's inspection; rather, defendant must make a specific request so that the court can determine if the evidence will affect the outcome of the trial).

Defendants, moreover, bear the burden of showing that the government has failed to disclose material or exculpatory evidence. See *Harris v. United States*, 9 F.Supp.2d 246, 275 (S.D.N.Y. 1998) ("[T]he government does not bear the burden of establishing that documents were not withheld; it is [defendant's] burden to prove that the government failed to disclose evidence favorable to [him]," citing *United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995)).

5

Conclusory allegations that the government has withheld evidence will not entitle defendants to relief or to an evidentiary hearing. See *id*. ("Conclusory allegations that the government 'suppressed' or 'concealed' evidence do not entitle [defendant] to relief; nor do they suffice to entitle [him] to an evidentiary hearing on whether documents were withheld").[11]

When the government "represents that it 'has produced every document in its possession which relates in any way to [an issue]' . . . the court must assume the veracity of that representation." *Upton*, 856 F.Supp. at 746. To hold otherwise would require the court to assume an unmanageable oversight role. See *id*. ("The alternative to such an assumption would require the court to examine numerous file drawers of documents to verify [the government's] representation which is as obviously undesirable as it is impractical").

### C. Whether to Grant Defendant's Motion

In her motion, Vicente seeks seven different categories of evidence.[12] The court has grouped these and will evaluate each category of evidence in turn to ascertain whether defendant's motion should be granted.

#### 1. "All Material Information" Including Evidence of Benefits to Victims and Cooperators

First, Vicente seeks "all information in [the government's] possession and control which is material and favorable to the defendant at sentencing, including information that could be used to impeach witnesses whose allegations are included in the presentence report and also including,

---

[11]See also *United States v. Avellino*, 136 F.3d 249, 260-61 (2d Cir. 1998) ("The government informed the court that it had 'disclosed all the state materials in the possession of federal authorities to [defendant]. . . . In the absence of a proffer by [defendant] of any nonspeculative basis for inferring that, in response to the plea withdrawal motion, the government had not made available to him all pertinent material in its possession, it was well within the discretion of the court to conclude that no evidentiary hearing was necessary"); *United States v. Evanchik*, 413 F.2d 950, 953 (2d Cir. 1969) ("[T]he assurance by the government that it has in its possession no undisclosed evidence that would tend to exculpate defendant justifies the denial of a motion for inspection that does not make some particularized showing of materiality and usefulness").

[12]Defendant's Motion at 1-2.

but not limited to, information about the current benefits that Flor Morales Sanchez and all of the other illegal alien witnesses who testified in the trial in this case are receiving or [are] in the process of receiving."[13] The court agrees that any evidence satisfying this description is material to punishment, as it could relate to the credibility of witnesses on whose testimony the probation department and the government rely in recommending a given sentence and/or on whose testimony aspects of the advisory guideline calculation are based.

The government states that it has "in the ordinary course of discovery throughout the proceedings in this case, already produced *Brady* and *Giglio* materials responsive to defendant [Vicente's] request for 'all information.'"[14] Consequently, it argues, it has "no further obligation" to produce further materials.[15] The court must assume the veracity of the government's representation regarding its prior productions.

The government acknowledges, however, that it has not provided defendant with current information regarding the benefits provided to or received by undocumented alien witnesses. The government supplied defendants with explicit and detailed information about such benefits as had been or might be obtained in June 2008, and supplemented this disclosure with a follow-up report in December 2008.[16] In addition, at trial, the government elicited testimony from Department of Labor Special Agent Quezada about the types of immigration benefits received by and available to testifying witnesses, including continued presence, T-visas, and significant benefit parole.[17] The government contends that "[i]n the face of such open and extensive disclosures [ ], there

---

[13]*Id.*

[14]Government's Opposition at 10-11.

[15]*Id.*

[16]*Id.* at 11; see also *id.*, Exhs. A & B (copies of June 2008 and December 2008 government disclosures re: benefits).

[17]RT at 2676-82 (January 29, 2009).

simply is no other information about 'benefits' to disclose."[18] It contends that it has no obligation "to track, record, and transmit to the defendants any immigration benefits the alien witnesses might have procured on their own after trial."[19] Additionally, the government asserts that Morales Sanchez "has not requested the prosecution's assistance with her immigration status, the prosecution has done nothing to obtain permission for [her] to remain in the United States post-trial, and the prosecution is unaware of any independent effort by [her] to remain in the United States."[20]

While this is a helpful start, the court concludes that the government has an obligation to supply defendants with current information on immigration or other benefits sought or received by all undocumented witnesses from the federal government. This information could have impeachment value to the extent that the testimony of these witnesses serves as one basis for the sentencing recommendation and/or advisory guideline calculation for each defendant. The government has greater ease of access to the information, which is collected and maintained by executive agencies with which the prosecution has worked throughout this case.[21] In fact, the government undertook to disclose the information to defendants at earlier stages of this action, and the court concludes that its obligation to supplement those disclosures continues through sentencing. Accordingly, the court grants Vicente's motion for disclosure of information regarding current benefits provided to or received by undocumented witnesses in this case.

---

[18] Government's Opposition at 11.

[19] *Id.* at 12.

[20] *Id.* at 13.

[21] This fact is not changed by the government's contention that "[s]ubsequent to trial, one or more of the victim witnesses may have applied on their own for T-visas with U.S. Citizenship and Immigration Services, but no government agency involved in the instant criminal matter submitted any information or otherwise endorsed such applications." (*Id.* at 13 n. 4.) The disclosures ordered here may clarify the extent to which the prosecution played a role in helping various witnesses secure benefits; that this role may be minor or nonexistent does not change the potential that evidence of benefits may be used to impeach witnesses whose testimony serves as a basis for the recommended sentences and/or advisory guideline calculation.

## 2. Copies of Requests for Telephone Recordings and Actual Telephone Recordings and Approved Telephone Numbers Lists

Vicente next requests that the government "disclose copies of all requests for telephone records, including copies of recordings of telephone conversations, made by the U.S. Attorney's Office and Department of Justice or any law enforcement agency, pertaining to calls made by Vicente, Mirna Vasquez Valenzuela, Luis 'Armando' Vicente, Gladys Vasquez Valenzuela, and Flor Morales Sanchez while incarcerated from December 20, 2006 through February 11, 2009."[22] She also seeks "copies of recordings of all jail telephone calls made by Flor Morales Sanchez and Juan Manuel Montez Velazco," both of whom cooperated with the government and testified against the defendants in this case.[23] In addition, Vicente requests that the court order disclosure of "copies of the list or lists of approved telephone numbers associated with [her], Reg. No. 44389-112, maintained with her MDC counselor for the period January 1, 2007, through August 31, 2007 (i.e., the list of telephone numbers that [she] was permitted to dial when she was an inmate at MDC during the specified period according to BOP inmate telephone list procedures set forth in 28 C.F.R. 540.101 and BOP Policy Statement 5264.08."[24]

Vicente's interest in these materials stems from Morales Sanchez's trial testimony. Morales Sanchez was examined about an interview she gave to defense investigator Alfredo Rasch in 2007, prior to her arrest. On direct, Morales Sanchez testified that Vicente contacted her from prison via telephone.[25] The parties dispute whether the call was made to Morales Sanchez's cell phone or instead to the home phone number of Mrs. Corado, with whom Morales Sanchez lived

---

[22]Defendant's Motion at 2. Vicente acknowledges that during trial, the government called a Bureau of Prisons employee, who testified that prison telephone call recordings are purged after six months. She contends, however, that "[w]hat remains unknown is whether the government ever requested copies of recordings of [her] telephone calls during the January 2007 through August 2007 period." (*Id.* at 15.)

[23]*Id.* at 2.

[24]*Id.*

[25]RT at 1511-12 (January 20, 2009).

9

for a short time prior to her arrest.[26]  During the call, Vicente allegedly instructed Morales Sanchez to tell Rasch that Vicente had treated various victims well and that they were not with her against their will.[27]  Vicente contends that the requested telephone records and recordings "will reveal whether there was a telephone call between [her] and Flor Morales Sanchez; the defense is confident that such records will reveal that no such conversation ever took place between [her] and Flor Morales Sanchez, and that the story concocted in court, which took the form of the testimony of Morales Sanchez, was a pure fabrication designed to undermine exculpatory statements that Morales Sanchez had made to an investigator [Rasch]."[28]  Vicente argues that the Bureau of Prison ("BOP") inmate telephone lists "will reveal that Morales Sanchez's cell phone

---

[26]The transcript of the proceedings reflects this dispute:
"[AUSA Murphy:] While you were out on bail, did you hear from Angela?
[Morales Sanchez:] Yes. [Q:] Did Angela – how did you hear from Angela?
[A:] Because one day she called me on my cell.
  [AUSA Murphy:] Your Honor, I'd ask that the [answer] be limited [to] she
  called me on the telephone.  The rest would be nonresponsive
  [The Court:] Would you like to withdraw your question?  I'll strike the
  answer, and you can ask a new one.
  [AUSA Murphy:] Sure.
  [The Court:] All right.  Ladies and gentlemen, all that was translated for
  you was 'because she called me.'  So that answer is stricken and you are
  directed to disregard it.
[AUSA Murphy:] When you heard from Angela while you were out on bail, was
it a telephone conversation? [A:] Yes."  (RT at 1511-12.)
The government explains that "[a]lthough the transcript records Morales [Sanchez]'s answer as 'She called me on my cell,' the transcript is incorrect, likely because the objection interposed by government counsel interrupted the Spanish to English translation of Morales [Sanchez]'s answer. [ ] In the unstricken remainder of Morales [Sanchez]'s testimony (the only part that remains in the record), she consistently testifies that defendant Angela called her on the Corados' home telephone [ ].  Thus, phone calls to Morales [Sanchez]'s cellular telephone and Angela's ability to call Morales [Sanchez]'s cellular telephone are not relevant." (Government's Opposition at 15-16 (record citations omitted).)  In Morales Sanchez's subsequent responses, both on cross-examination and redirect, she testified consistently that she was contacted on Mrs. Corado's telephone. (See RT at 1519-20 (cross-examination by Price); *id.* at 1627-28 (cross-examination by Buehler) (January 21, 2009).)

[27]RT at 1512-13.

[28]Defendant's Motion at 9; see also *id.* at 16 (expanding on this theory).

10

number was not even on the approved list of telephone numbers associated with [her] and that [she] could not have called Morales Sanchez on her cell phone."[29]

Additionally, Vicente contends that prison phone calls made by Morales Sanchez and Montez Velasco may contain information that "would corroborate the theory" that their testimony was false.[30] Telephone call records for co-defendants Gladys Vasquez Valenzuela, and Mirna Vasquez Valenzuela are sought "for the purpose of obtaining recordings of any calls between them and Morales Sanchez."[31] Finally, call recordings for Luis Vicente Vasquez are requested "because it is known that he spoke regularly with Morales Sanchez from the time of his arrest until the trial."[32]

In response to these requests, the government contends that it has twice previously disclosed the report of a January 12, 2009 interview with Morales Sanchez, in which she first told the government that she had been interviewed by Rasch and made exculpatory statements regarding Vicente because of her fear of Vicente.[33] The government also argues that Vicente's requests are overbroad and insufficiently supported by a showing that the information sought is material or exculpatory.[34] In particular, the government asserts that the PSR's application of a two-level enhancement for obstruction of justice has nothing to do with alleged calls between Vicente and Morales Sanchez; rather, the obstruction enhancement "is based on [Vicente's] conduct after Morales [Sanchez] was arrested, specifically, [Vicente's] attempts to intimidate

---

[29]*Id.* at 9.

[30]*Id.* at 16-17.

[31]*Id.* at 17.

[32]*Id.*

[33]Government's Opposition at 16; *id.*, Exh. C (copies of materials). The government explains that it was not aware of the Rasch interview until January 2009, and thus "had no reason to anticipate that [Vicente's] recorded calls contained any relevant information – whether incriminating or exculpatory." (Government's Opposition at 19.)

[34]*Id.* at 17.

11

Morales [Sanchez] into withdrawing her cooperation plea and refusing to testify against defendants, which occurred while both [women] were imprisoned at San Bernardino County Jail."[35] It is also based on Vicente's threats to victims to prevent them from reporting the crimes to the police while the offenses were being committed.[36]

The court does not agree with the government that the types of information requested are immaterial, nor that Vicente has made an inadequate showing of their potential materiality for the purposes of this *Brady/Giglio* motion. Instead, it credits Vicente's position that such materials, if in existence, could contain material exculpatory or impeachment evidence favorable to Vicente and relevant to her punishment.

The next question, therefore, is whether any of these materials have been suppressed by the prosecution. The government contends that Vicente's demands for telephone call recordings and for the list of telephone numbers she was able to call from jail should be denied because the evidence was equally available to her. Additionally, it references language in Vicente's motion indicating that she is already in possession of the "approved numbers" list.[37] In its opposition,

---

[35]*Id.*

[36]*Id.*, n. 7.

[37]*Id.* at 18-19 ("In fact, defense counsel submitted a declaration in support of the motion stating that defendant [Vicente] 'informed [him] that the telephone number associated with [Morales Sanchez's] cell phone never appeared on her list of approved telephone numbers,'" citing Price Decl., ¶ 6.)
On Friday, July 10, the government filed a sur-reply with additional information pertinent to defendant's motion. (Docket No. 823.) The government represents it has learned that the BOP "possesse[s] a list of the numbers called from BOP custody by the pin code assigned to defendant [Vicente] during the entire period of her incarceration." (Government Sur-reply at 3.) The government has obtained this list and produced it to all defendants. (*Id.*; *id.*, Exh. B (copy of correspondence from AUSA Cheryl Murphy to defendants).) It has also requested that MDC disclose the list of telephone numbers Vicente was permitted to call while she was in custody; the MDC has not yet produced this list, but the government states that it will provide the list to defendants as soon as it is received from the MDC. The government notes that Vicente has been able to obtain this list and make changes to it at all times while she has been in custody, and that the MDC maintains only the most recent version of the list. Thus, the list that the MDC has been asked to produce will not reflect numbers that either Vicente or the MDC previously deleted.

the government stated that it did not possess recordings of Vicente's jail telephone calls for May to July 2007, but did not address other aspects of Vicente's request.[38] At the hearing, the government clarified that it had made two requests for telephone records from the BOP: one in April 2007 (which yielded records from December 2006 through April 2007) and one in June 2008 (which yielded records from January 2008 through June 2008). On the basis of this clarification, the court directs the government to review all telephone records in its possession and to produce all records that are responsive to defendant's request.

As for telephone records or recordings the government did not request or receive, it is under no obligation now to try to obtain the records – most of which have long since been destroyed,[39] and which defendants could easily have subpoenaed themselves. "Since suppression by the Government is a necessary element of a *Brady* claim, . . . if the means of obtaining the exculpatory evidence has been provided to the defense, the *Brady* claim fails. . . . 'Where defendants . . . had within their knowledge the information by which they could have ascertained the supposed *Brady* material, there is no suppression by the government." *United States v. Dupuy*, 760 F.2d 1492, 1502 n. 5 (quoting *United States v. Griggs*, 713 F.2d 672, 674 (11th Cir. 1983)) (citations omitted). See also, e.g., *United States v. Bracy*, 67 F.3d 1421, 1428-29 (9th Cir. 1995) ("This disclosure provided all the information necessary for the defendants to discover

---

(Government Sur-Reply at 3.)

[38] Government's Opposition at 18 n. 8.

[39] At trial, government witness and MDC employee Albert Colon testified that, pursuant to BOP policy, inmate telephone calls at MDC are recorded but are automatically deleted from the system after six months. (RT at 2374, 2378-79 (January 28, 2009).) In its sur-reply, the government indicates that it learned "on July 9, 2009 that the Bureau of Prisons [ ] is not capable of retrieving the deleted recordings of any of defendant [Vicente's] telephone calls between May 2007 and July 2007. . . . Defendant [Vicente] did not request, prior to filing the instant motion, that the government investigate whether the deleted recordings could be restored by forensic examination of the hard drive on which they had been originally stored. In response to [her] motion, the government investigated the matter and learned that the recordings cannot be retrieved. . . . Accordingly, there are no recordings to produce." (Government Sur-Reply at 2; *id.*, Exh. A (July 2009 Letter from W. Howard Harrell to AUSA Cheryl Murphy).)

13

the alleged *Brady* material on their own, so the government was not guilty of suppressing any evidence favorable to [defendant]" (citations omitted)); *United States v. Aichele*, 941 F.2d 761, 764 (9th Cir. 1991) ("The prosecution is under no obligation to turn over materials not under its control. When, as here, a defendant has enough information to be able to ascertain the supposed *Brady* material on his own, there is no suppression by the government" (citations omitted)) .[40] Here, there is nothing to suggest that Vicente was unaware of the identities of the parties whose telephone calls might have relevance for her case, nor that she could not have subpoenaed recordings or other telephone records prior to their deletion by MDC officials. Put differently, Vicente had enough information to ascertain the supposed *Brady/Giglio* material on her own. There is, accordingly, no suppression by the government.

To summarize, the court orders the government to produce copies of any telephone records it received, or any responses stating that records did not exist, that are responsive to defendant's motion. If the government did not request or receive such records, it is under no obligation to now try to recover the same.

### 3. Pen Register Information for Any Telephone Used by Vicente in MDC from January through August 2007

Vicente also requests pen register information for any telephone she used at the MDC from January through August 2007.[41] The government responds that "no pen registers were used in the investigation or prosecution of this case," and "there is simply no information to disclose."[42] In view of this representation, defendant's motion is denied to the extent it requests pen register information.

### 4. Rough Notes Pertaining to Witness Interviews

---

[40]See also *Giles v. State of Maryland*, 386 U.S. 66, 96 (1967) (White, J., concurring) ("In the end, any allegation of suppression boils down to an assessment of what the State knows at trial in comparison to the knowledge held by the defense").

[41]Defendant's Motion at 2.

[42]Government's Opposition at 21.

1  Lastly, Vicente requests "all rough notes of all law enforcement agents, and attorneys for
2  the government, . . . of all interviews of all witnesses who testified in the trial in this case, and
3  . . . copies of all rough notes or memoranda of any attorney or investigator pertaining to
4  interviews of witnesses who testified in the trial – including any attorney for any of the victims,
5  that were disclosed to the government."[43]

6  With respect to notes in its possession, the government represents that, prior to trial, it
7  produced the interview reports of all witnesses who testified at trial; it observes that defendants
8  relied on those reports in attempting to impeach the government's witnesses.[44] The government
9  also states that "before the commencement of trial, agent notes were reviewed for any material
10 discrepancies from the interview reports and none were found."[45] Law enforcement officials
11 present when witnesses were interviewed in preparation for their trial testimony prepared
12 additional reports of investigation, which "documented any actual or perceived discrepancies or
13 new information."[46] The government represents that its attorneys present at these interviews
14 conferred with the agent(s) to ensure that *Brady* or *Giglio* material from the interviews were
15 contained in these follow-up reports.[47] It appears, therefore, that all *Brady/Giglio* material from
16 the government's rough notes has already been produced to defendants.

17 With respect to Vicente's request for rough notes or memoranda prepared by attorneys for
18 the victim-witnesses, the government explains that "such notes constitute attorney work product,
19 were not disclosed to the government, and are not in the possession, custody, or control of the
20 government."[48] Accordingly, defendant's motion for disclosure of these materials must be denied.

---

[43]Defendant's Motion at 2.

[44]Government's Opposition at 22.

[45]*Id.* at 23.

[46]*Id.* at 23-24.

[47]*Id.*

[48]*Id.* at 25.

15

See, e.g., *United States v. Plunk*, 153 F.3d 1011, 1028 (9th Cir. 1998) ("However, while the prosecution must disclose any *Brady* information within the possession or control of law enforcement personnel, it has no duty to volunteer information that it does not possess. As a general matter, information beyond that contained in the government's files is not subject to the strictures of *Brady*. In this case, the notes that Plunk sought were in the files of the federal public defender; consequently, the prosecution did not 'possess' or 'control' the requested information. The government was therefore under no obligation to search for or to provide the notes" (quotation marks and citations omitted)), opinion amended on other grounds on denial of rehearing, 161 F.3d 1195 (9th Cir. 1998), cert. denied, *Plunk v. United States*, 526 U.S. 1060 (1999).

### III. CONCLUSION

For the reasons stated, defendant's motion for disclosure of exculpatory or impeachment evidence relevant to sentencing is denied in part and granted in part. The government is directed to provide the defendants with up-to-date information on immigration benefits sought and received by all witnesses by **July 20, 2009.** To the extent the government is in possession of any telephone records or recordings responsive to defendant's request, it must produce them by this date as well. In all other respects, defendant's motion is denied.

DATED: July 14, 2009

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE